Robert E. KENNEDY, Petitioner–Appellant,

v.

Bill LOCKYER, Attorney General, State of California, Respondent–Appellee.

No. 01–55246.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 2003.

Filed June 14, 2004.

Amended Aug. 18, 2004.

Jeff Dominic Price, Esq., Santa Monica, CA, for the appellant.

Lora Fox Martin and Anthony DaSilva, Deputy Attorney Generals, San Diego, CA, for the appellee.

Before REINHARDT, O'SCANNLAIN, and FISHER, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge FISHER; Dissent by Judge O'SCANNLAIN

REINHARDT, Circuit Judge:

Robert Kennedy was tried twice on a charge of selling 0.08 grams of a substance in lieu of a controlled narcotic drug—a substance that looked like an illegal drug but wasn't—to an undercover police officer for $20. The first trial ended in a hung jury: four jurors favored finding Kennedy not guilty; eight jurors thought him guilty. Prior to his second trial, Kennedy twice asked the state court to provide him with a complete transcript of the earlier proceed-

ing. It refused to do so. Instead, it granted him only the portion of the transcript that contained the witnesses' testimony and denied him the portion that contained the parties' motions and the court's rulings thereon, as well as the court's instructions and the parties' opening statements and closing arguments.

At the second trial, Kennedy was represented by a new attorney who proceeded without the aid of a complete transcript of the prior trial. Aware that the new attorney did not have the full transcript, the state introduced evidence intended to show gang involvement on Kennedy's part—evidence that had been excluded from the first trial after a successful pre-trial motion to suppress. This time, after a one day trial and three days of deliberations, the jury returned a guilty verdict. Because Kennedy had two prior serious or violent offenses, he was sentenced for the $20 sale of a non-drug to a prison term of twenty-five years to life, pursuant to California's Three Strikes Law, Cal.Penal Code §§ 667(e) and 1170.12(c)(2) (2003).

Kennedy appeals the district court's dismissal of his habeas corpus petition. He argues that his Fourteenth Amendment right to due process and equal protection was violated when the state court denied his request for the full transcript of his first trial. Because the state court's decision was contrary to clearly established Supreme Court law, we reverse the district court and direct it to grant Kennedy's habeas petition.[1]

# I

*The Second Trial*

The prosecution's principal witness in the second trial, as in the first, was Detective Leroy McDowell of the San Diego Police Department. Detective McDowell testified that he was working undercover narcotics detail in casual clothes one afternoon in October of 1995. Another officer dropped him off near the intersection of 22nd and J Streets in San Diego. McDowell testified that when he saw Kennedy and Randall Tucker across the street, he made eye contact with Kennedy and nodded his head. McDowell said that he approached the two men and asked, "Are you serving?," meaning in street terminology, "Are you selling drugs?" Tucker responded by saying, "What?" McDowell testified that he asked the question again and Tucker responded, "What do you want?" McDowell said he told the two men that he wanted a "2–0," which he testified means $20 of rock cocaine or another controlled substance. In response, Tucker asked, "2–0 of what?;" McDowell said he repeated, "2–0."

McDowell said that Kennedy then asked for money, and he took a prerecorded $20 bill from his pocket and gave it to him. Kennedy put the bill in his pocket and said to Tucker, "Give it to him, cuz." Tucker walked over to the fence, picked up a paper bag, and handed it to McDowell. Inside the bag were pieces of an off-white, rock-like substance. Tucker asked if McDowell was a police officer, and McDowell said, "No, why would I be down here if I was the police?"

McDowell testified that he looked in the bag, told Tucker that there was not enough there, and asked him to give him some more. Tucker then said, "That's all we have. Come back later we'll give you some more." McDowell then said, "No, at least give me $5 of my money back."

McDowell walked away from Kennedy and Tucker and alerted the other officers

---

1. In view of our holding, we do not reach Kennedy's two other claims: (1) that he was prejudiced by his counsel's ineffective assistance, and (2) that California's Three Strikes Law is unconstitutionally vague.

who were waiting nearby. The officers then moved in and arrested the two. In Kennedy's pocket, they found the marked $20 bill. The bag contained 0.08 grams of a "non-controlled substance" that had the appearance of an illegal drug.

Although Tucker pled guilty after the first trial, and thereby avoided a three-strike twenty-five years to life sentence,[2] he testified for the defense at the second trial. His testimony differed from McDowell's. Tucker testified that he and Kennedy had been hanging out in the area all day and earlier had been stopped and patted down by police, who found nothing on either man. Tucker told the jury that, when McDowell approached the two, no drugs were ever mentioned but that he noticed McDowell had money in his hands. Tucker said McDowell handed the money to him. Because McDowell was "pushing too much," Tucker walked over to a nearby area, picked up a piece of paper bag, and gave it to McDowell. Tucker said "2–0" and "are you serving" can mean different things, and that he did not know what McDowell wanted.

In addition to Detective McDowell's testimony regarding the actual event, the prosecution elicited "gang" testimony from him. The prosecutor asked McDowell if he could tell the jury what the word "cuz" meant, as it was used by Kennedy during the transaction. He replied, "Terminology used by Cripp gang members." The prosecutor persisted, "Is it on the street used for—commonly used between individuals that are working together?" McDowell answered, "Generally, it was most—a lot of people use it and—but basically gang members and those that want to be gang members."

*Procedural History*

The first trial was a joint trial of the two co-defendants. At a pre-trial hearing, Kennedy's counsel moved in limine to exclude all references to any gangs and any gang affiliation; the court granted the motion in a written order which provided that, "There will be no mention of 'gangs or gang affiliation,' unless cleared by the Court, out of the presence of the jury."

During the discussion of the motion, the court explained that evidence of possible gang involvement, if introduced at all, could be used only for impeachment purposes, to prove Kennedy and Tucker's relationship. Before the prosecution could impeach Kennedy on this basis, however, the judge stated that he would hold a hearing outside the presence of the jury, after which he would make a determination as to whether the evidence should be admitted for even this limited purpose. The judge told the prosecutor he would "have to be pretty convincing before [he would] let that[evidence] come in." The transcript of the discussions regarding the motion to exclude and the court's ruling thereon was not given to Kennedy or his counsel prior to the second trial.

As soon as the mistrial was declared, Kennedy's counsel moved for a complete transcript of the first trial in order to prepare for the expected second trial. The judge ruled that Kennedy was entitled only to a transcript of the trial testimony; he denied him the remainder of the transcript, including the parties' opening statements and closing arguments, evidentiary motions and rulings, jury instructions, and all other motions and colloquies. The following exchange occurred between Kennedy's counsel and the court:

---

**2.** Because Tucker had two prior strikes for violent felonies, if a jury had convicted him of the offense he was charged with, he would in all likelihood have been sentenced to, at a minimum, twenty-five years to life pursuant to California's Three Strikes law. Instead, he entered into a plea agreement with the prosecution striking his prior offenses in return for a guilty plea, and received a sentence of 32 months.

[Counsel]: Your Honor, I'd also ask for an order for a transcript being prepared for the purpose of the next trial.

[Court]: Well, you can submit that to the court after—I'd—I'd—I would hope that wouldn't be necessary to go to that expense, but I'd like to explore some disposition short of that. But if it's going to trial then I think the case law says that you're entitled to that transcript, just of the testimony, not of the entire trial.

[Counsel]: That's fine, your Honor.

[Court]: All right.

A second trial date was then scheduled. During a pre-trial hearing, Kennedy told the judge that he was dissatisfied with his counsel's representation and moved to proceed *pro se*. The motion was granted and new stand-by counsel was appointed. At the hearing, before relieving counsel of her responsibilities, the court inquired whether she had ordered a transcript of the first trial. She responded that she already had one and would make it available to Kennedy. In fact, however, counsel had only the transcript of the witnesses' testimony at trial, not the full proceedings.

Ten days later, Kennedy, now proceeding *pro se*, asked the court to provide him with a full trial transcript in order to enable him to prepare for the second trial. During the hearing on this motion, Kennedy told the judge that he did not have his "full trial transcripts" and that he only had the testimony of the witnesses at the first trial. He told the judge that he needed, at the very least, the transcript of "all motions, opening statements, and final argument." Kennedy and his standby counsel (who later became appointed counsel) [3] explained that Kennedy needed to review the full transcript so that he could prepare his defense for the second trial. The court denied the request. [4]

During the second trial, the prosecution, which was aware that the prior trial judge had excluded any mention of Kennedy's alleged gang involvement, proceeded, deliberately, to elicit testimony from Detective McDowell on the subject of gangs. The prosecutor asked Detective McDowell what the word "cuz," used by Kennedy during the street discussion, meant. McDowell testified that when Kennedy said, "Give it to him cuz," that "cuz" was "[t]erminology used by Cripp gang members." On further questioning by the prosecutor, McDowell elaborated, stating that "cuz" is a phrase "basically" used by "gang members and those that want to be gang members."

The trial lasted one day, but the jury deliberated for three. During the course of their deliberations, the jurors asked that McDowell's testimony be read back to them. Ultimately, the jury returned a guilty verdict, and the court sentenced

---

**3.** At the commencement of Kennedy's second trial, he moved to terminate his *pro se* status and have stand-by counsel appointed as his trial counsel. The motion was granted.

**4.** The court colloquy regarding this request was:

[Stand-by Counsel ("Gayton")] It's only the trial testimony that's been made available. I think counsel agreed only—stipulated to trial testimony, because I believe she felt that she was going to be trying the case, Ms. Feral. But since she's not trying the case, he's requesting the full transcript, in-

cluding all motions, openings statement and final argument.

[Court] Why does he need that?

[Gayton] He needs to review that in order to prepare for his next trial.

[Court] Why?

[Gayton] He thinks a lot of those—

[Court] He's entitled to trial testimony. All the motions were in writing, right?

[Gayton] I don't know, I wasn't there. But, I mean, I consulted with Ms. Feral, and she said that she had requested a full trial transcript. . . .

[Court] Denied. Anything else?

Kennedy to a prison term of twenty-five years to life pursuant to California's Three Strikes Law. Cal.Penal Code §§ 667(e) and 1170.12(c)(2).

The California Court of Appeal affirmed the conviction. After the California Supreme Court summarily denied review, Kennedy filed a habeas corpus petition in federal court. The magistrate judge recommended dismissal of the petition, and the district court adopted the magistrate's recommendation. Kennedy appealed.

## II

*AEDPA Standard of Review*

We review *de novo* the district court's decision to grant or deny a petition for habeas corpus. *Dows v. Wood,* 211 F.3d 480, 484 (9th Cir.2000). The petition in this case was filed on November 26, 1999, well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, AEDPA's provisions apply, and our review of the state court's decision is governed by them.

Under AEDPA, we may grant a writ of habeas corpus to a person in state custody only if the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding," 28 U.S.C. § 2254(d)(2), or the claimed constitutional error "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state court's merit determination is "contrary to" United States Supreme Court clearly established law if it applies a rule (1) "different from the governing law set forth in [Supreme Court] cases," *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843,

152 L.Ed.2d 914 (2002), or (2) if it "confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Price v. Vincent,* 538 U.S. 634, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003).

## III

■ It is well-established that "the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). Applying this fundamental legal principle, the *Britt* Court held that the state is ordinarily required to provide an indigent defendant with the transcript of the proceedings of a prior mistrial in order to aid him in preparing for a second trial. *Id.* at 227–28, 92 S.Ct. 431. Here, the state does not dispute that Kennedy was entitled to a transcript of his prior mistrial. Rather, it contends that, under the relevant Supreme Court cases, an indigent defendant is entitled only to a transcript of trial testimony, not to a full transcript of the proceedings of the prior trial. The state is incorrect.

■ The Supreme Court held in *Britt* that "the State must provide an indigent defendant with a transcript of *prior proceedings* when that transcript is needed for an effective defense or appeal." *Id.* at 227, 92 S.Ct. 431 (emphasis added). Although the Court did not define "prior proceedings" in its opinion, the meaning of the term is clear. *Black's Law Dictionary* defines "proceeding," in relevant part, as "the regular and orderly progression of a lawsuit, including *all* acts and events between the time of commencement to the entry of judgment."[5] *Black's Law Dictio-*

5. *Black's Law Dictionary* specifies that:

the term proceeding may include—(1) the

*nary* 1221 (7th ed.1999) (emphasis added); *see also Black's Law Dictionary* 1204 (6th ed. 1990) ("The proceedings of a suit embrace *all* matters that occur in its progress judicially.") (emphasis in original). From the dictionary definition it follows that the most "natural understanding" of "prior proceedings" is one that encompasses *all* of the acts and events that occur from the commencement of the judicial action until the entry of judgment. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 2047, 156 L.Ed.2d 18 (2003) (adopting the most natural understanding of a given term as defined in the dictionary). Because parties' motions, and the court's rulings thereon, as well as opening statements and closing arguments, and the jury instructions all occur during the course of the judicial action, they are part of the proceedings. In asking this court to limit the meaning of "prior proceedings" to a transcript of witness testimony, the state would have us construe the term so as to violate its ordinary and plain meaning. We are not free to do so. *See Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470–71, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997) (refusing to adopt the Commission's reading of a term which violated the term's ordinary and plain meaning).

There is nothing in the Supreme Court's *Britt* decision or in any other Supreme Court case dealing with the provision of transcripts of proceedings that would permit the adoption of as narrow and cramped a reading as the state suggests. Rather, the Supreme Court's other relevant decisions support our adoption of the term's literal construction. For example, the Court in *Griffin v. Illinois*, 351 U.S. 12, 13, n. 3, 76 S.Ct. 585, 100 L.Ed. 891 (1956), held that, on appeal, indigent defendants must be provided with a free copy of a "report of proceedings," defined by the Court as "all proceedings in the case from the time of the convening of the court until the termination of the trial[,]" including "all of the motions and rulings of the trial court, evidence heard, instructions and other matters which do not come within the clerk's mandatory record."[6] The Court's adopted definition of "report of proceedings" closely mirrors the dictionary meaning of "proceeding" provided in *Black's;* because of the *Britt* Court's reliance on *Griffin*, we infer that the Court meant its definition of the term "proceedings" to be the same as the definition of "proceedings" used in *Griffin. Britt*, 404 U.S. at 227–28, 92 S.Ct. 431. Further, in *Mayer v. City of Chicago*, 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971), the Court held that on appeal an

institution of the action; (2) the appearance of the defendant; (3) all ancillary or provisional steps, such as arrest, attachment of property, garnishment, injunction, writ of *ne exeat;* (4) the pleadings; (5) the taking of testimony before trial; (6) all motions made in the action; (7) the trial; (8) the judgment; (9) the execution; (10) proceedings supplementary to execution, in code practice; (11) the taking of the appeal or writ of error; (12) the *remittitur*, or sending back of the record to the lower court from the appellate or reviewing court; (13) the enforcement of the judgment, or a new trial, as may be directed by the court of last resort.

*Id.*

**6.** The Supreme Court subsequently extended *Griffin* to require the state to provide indigent defendants with transcripts of (a) state post-conviction proceedings, *Long v. District of Iowa*, 385 U.S. 192, 192–94, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966) (*per curiam*); (b) state habeas evidentiary hearings, *Gardner v. California*, 393 U.S. 367, 370, 89 S.Ct. 580, 21 L.Ed.2d 601 (1969); and (c) petty offense trials, *Williams v. Oklahoma City*, 395 U.S. 458, 459, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969).

indigent defendant must be provided with a "full verbatim record where that is necessary to assure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way." *Id.* at 195, 92 S.Ct. 410. Again, the Court did not define "full verbatim record," but its meaning is clear. *Black's* defines "record on appeal," as "the history of the proceedings on the trial of the action below (with the pleadings, offers, objections to evidence, rulings of the court, exceptions, charge, etc.), in so far as the same appears in the record furnished to the appellate court in the paperbooks or other transcripts." *Black's Law Dictionary* 1274 (6th ed.1990).[7] The Court has made it clear that a transcript of pre-trial, as well as trial, proceedings must be provided. *Roberts v. LaVallee,* 389 U.S. 40, 42–43, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967) (holding that state court must provide indigent defendant with his preliminary hearing transcript). Courts of Appeal have long understood its rulings. *See, e.g., United States v. Devlin,* 13 F.3d 1361,1365 (9th Cir.1994) (holding that the state must provide an indigent defendant

with a suppression hearing transcript for trial preparation purposes); *United States v. Vandivere,* 579 F.2d 1240, 1243 (10th Cir.1978) (holding that "the presumption should be that indigent defendants in criminal cases are entitled to a transcript of any preliminary examination"); *United States v. Young,* 472 F.2d 628, 629 (6th Cir.1972) (holding that reversal was required where the trial court refused to grant defendant's motion for a transcript of the first trial and the preliminary examination).[8]

Moreover, limiting the right to a transcript of a prior mistrial to the receipt of the transcript of witnesses' testimony would be contrary to the Court's reasons for requiring the state courts to provide such transcripts. In *Griffin* and its progeny, the Court made it clear that the provision of a full transcript was necessary to ensure that indigent defendants have the same opportunity to effectively defend themselves against criminal charges as those with money to buy transcripts. *See, e.g., Roberts,* 389 U.S. at 42, 88 S.Ct. 194 (1967) ("Our decisions for more than a decade now have made clear that differ-

---

**7.** As we explain later, appeals are different from second or successive trials in that appeals ordinarily involve only the specific issues the defendant chooses to raise; accordingly, only the portions of the transcript that are relevant to those specific issues must be provided in the particular case.

**8.** Our dissenting colleague cites to *United States v. Kirk,* 844 F.2d 660 (9th Cir.1988), for his suggestion that the *Britt* principle is ambiguous as it relates to a defendant's right to a transcript of proceedings of a prior mistrial. Dissent at 1059–60. He fails to report, however, that in *Kirk* there was no dispute that the defendant was entitled to the full transcript of proceedings from his prior trial in which the jury had hung. In fact, the district court in that case granted him such a transcript "in full." *Kirk,* 844 F.2d at 662. Our statement regarding ambiguity in the application of *Britt* related only to the unique question of the obligation to provide a transcript

of a trial in which the defendant had been severed as a co-defendant after two weeks. *Id.*

Our precedent, which we recognize is only persuasive authority, has established that preliminary proceedings must be provided not only to indigent defendants whose trials ended in a mistrial, but more generally to indigent defendants preparing for a first trial. Thus, in *United States v. Devlin,* 13 F.3d 1361 (9th Cir.1994), citing *Britt,* we held that "[n]either fairness nor efficiency support[ed] imposing a preliminary requirement that [the defendant] prove he had a particular need for [a] transcript" of a suppression hearing. *Id.* at 1365. We further stated that "[c]ourts should ... routinely grant indigent defendants' timely requests for free transcripts of significant prior proceedings, unless a substantially equivalent alternative device is available." *Id.* Because the Government had failed to establish that a practicable alternative to the transcript existed, we found error.

ences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution."). We doubt seriously that a wealthy defendant would ordinarily proceed in a subsequent trial without purchasing a full transcript of the proceedings, including, but not limited to, the parties' motions and the court rulings thereon and the opening statements and closing arguments. *Britt,* 404 U.S. 226, 92 S.Ct. at 437–38 (Douglas, J., dissenting) (stating that "wealthier defendants tend to purchase transcripts as a matter of course"); *Martin v. Rose,* 525 F.2d 111, 113 (6th Cir.1975) ("[W]e can think of no more valuable document for defense counsel approaching a contested trial than the record of the previous trial of his client for the exact same crime with which he is charged again before the court · of another sovereign. We cannot conceive of a competent lawyer for an affluent client who would not order a trial transcript under such circumstances.").

Portions of the transcript, other than the testimony of witnesses, are often crucial to the preparation of an effective defense. Opening and closing arguments may provide valuable insight into the government's strategy; motions to suppress or exclude often reveal, as here, informa-tion regarding damaging and prejudicial evidence that the state plans to introduce, and the rulings thereon may sometimes be case-dispositive. *Cf. United States v. Ash,* 413 U.S. 300, 310–311, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) (stating that the result of "critical confrontations" of the accused by the prosecution at "pretrial proceedings" might well "settle the accused's fate and reduce the trial itself to a mere formality") (*quoting United States v. Wade,* 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). The state's contention that such portions of the proceedings need not be furnished to indigent defendants cannot be reconciled with the Court's stated purpose in establishing the right to a transcript of prior proceedings, to ensure that the defendant can prepare an "effective defense," or with its mandate that poor defendants have the same access to transcripts and other basic materials as the wealthy. *See Britt,* 404 U.S. at 227, 92 S.Ct. 431.

We conclude that the Court's cases clearly establish that an indigent defendant must be provided with a transcript of prior proceedings which includes, among other things, motions and the court's rulings thereon, as well as opening statements, closing arguments, jury instructions, and relevant colloquies.[9] California

---

9. The dissent states that "at least one court" has reached a decision that Supreme Court law does not extend to providing a full transcript of prior proceedings after a mistrial and, from that, we should reach the conclusion that the law is not clearly ·established. For support, the dissent cites a single unpublished memorandum in which the Fourth Circuit summarily dismissed an appeal from the lower court's decision. Dissent at 1059–60. Outside of providing questionable precedential authority, the lower court's decision is inapplicable here. The case involved a defendant's request for portions of a transcript of prior proceedings for use *on appeal. See Williams v. Leeke,* 444 F.Supp. 229, 232 (D.S.C.1976). As we discuss later, the Supreme Court has, understandably, set forth different principles for determining when due process requires the state to furnish a defendant with a full transcript on appeal. *See* discussion at 7861–62. Regardless, the Supreme Court has already debunked the dissent's formulation of AEDPA's requirements, stating that "[t]he federal habeas court should not transform the inquiry into a subjective one by resting its determination [ ] on the simple fact that *at least one of the Nation's jurists* has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Williams v. Taylor,* 529 U.S. 362, 410–11, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphasis added). The mere existence of conflicting authority does not mean that Federal law is not clearly established. *Id.* That the dissent misconceives

law is similar. In its decision, the California Court of Appeal conceded that under California Supreme Court precedent the trial judge erred in failing to provide Kennedy with the full transcript of prior proceedings. The Court of Appeal stated that the trial court "should have provided" the "additional portions of the transcript" requested by Kennedy.

Therefore, the Court of Appeal did not contend, as the state does here, that either Supreme Court or California case law provides indigent defendants with the right to witnesses' testimony only. Rather, the Court of Appeal held that the trial judge's failure to provide the indigent defendant with a full transcript of all proceedings did not require reversal because of the doctrine of "substantial compliance." Established Supreme Court law, however, does not provide a "substantial compliance" exception to the requirement that state courts provide a transcript of prior proceedings to indigent defendants facing a subsequent trial. Under *Britt*, it is assumed that a defendant will "ordinarily" need a complete transcript of a prior mistrial in order to present an effective defense. *Britt*, 404 U.S. at 228, 92 S.Ct. 431[10] (declaring the transcript of a prior mistrial to be valuable to the defendant both as a discovery device in preparation for the next trial and as a tool at the trial itself for the impeachment of witnesses); *see also Roberts*, 389 U.S. at 43–44, 88 S.Ct. 194 (finding it unnecessary to discuss the importance of a preliminary hearing transcript to the defendant and holding that the transcript must be granted notwithstanding the dissent's argument that

the petitioner had suggested no use to which the transcript could be put).

The state contends that *Mayer* has created an exception, similar to "substantial compliance," to the *Britt* rule that a defendant must be provided a complete transcript in order to prepare for a subsequent trial. The state's reliance on *Mayer* is in error; the exception delineated there is not applicable in the case of *second or successive trials*. *Mayer* addressed the issue whether the state must provide a defendant with a full verbatim record for use *on appeal*. The Court held that because an appellant's challenges to his conviction or sentence are limited to the specific issues raised by him in the appellate court (such as, for example, "the validity of the statute or the sufficiency of the indictment upon which conviction was predicated"), the state may show that the complete record contains extraneous material that it need not provide because it is irrelevant to the issues before the appellate court. *Mayer*, 404 U.S. at 194, 92 S.Ct. 410. Thus, on appeal, where the state meets its burden, it may provide an indigent defendant with "a record of sufficient completeness"—the record that is relevant to the issues raised—rather than a complete transcript, because "part or all of the stenographic transcript ... [is not] germane to the consideration of the appeal." *Id.* at 194–95, 92 S.Ct. 410. Because all of the proceedings from a first trial are ordinarily germane to a second trial (at least in the absence of a dismissal of some of the initial charges), the record of "sufficient completeness" exception is inapplicable. The Supreme Court acknowledged this when it failed to incorporate similar lan-

---

the law on this point should be self-evident: If one decision reaching a different result were enough to destabilize Supreme Court precedent, then, it is not an exaggeration to suggest that no Federal law would ever be clearly established.

**10.** The Court stated that serious doubts about a decision denying a request for a full transcript would arise "if it rested on petitioner's failure to specify how the transcript might have been useful to him." *Id.*

guage regarding a "record of sufficient completeness" in its *Britt* opinion—an opinion filed the same day as *Mayer*.[11]

The Court has recognized only one exception to the *Britt* requirement in the case of a second or successive trial. In *Britt*, the Court said that the state may provide an indigent defendant with an alternative device that would fulfill the same functions as a court-prepared transcript, but only after meeting its burden of establishing that the proposed alternative is sufficient. *Britt*, 404 U.S. at 230, 92 S.Ct. 431(stating that the defendant does *not* "bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight."). The state does not contend that this exception is applicable here.[12]

Our dissenting colleague contends that there is another exception to *Britt* in addition to the "narrow" exception discussed here. *Id.* at 227, 92 S.Ct. 431. He states that a free transcript need not be provided if it is not "necessary to an effective defense," and that for a "transcript to truly be 'necessary to an effective defense'" it need be more than "merely helpful." Dissent at 1061. He would then put the burden on the defendant to prove that there is a "need" for the transcript. The dissent's attempt to create a second exception conflicts directly with *Britt*. In *Britt*, the Supreme Court stated that a decision to deny a petitioner a transcript which rested on the "petitioner's failure to specify how the transcript might have been useful to him" would be constitutionally suspect. *Id.* at 228, 92 S.Ct. 431. It emphasized that its "cases ha[d] *consistently recognized* the value to a defendant of a transcript of prior proceedings, *without requiring a showing of need.*" *Id.* (emphasis added). In this regard, the Court cited *Roberts v. LaVallee*, in which it had granted the writ and concluded that, despite the fact that the petitioner had pointed to "*no use* to which the [preliminary hearing] transcript could have been put," the state was required to provide it. *Id.* at 228 n. 3, 92 S.Ct. 431 (emphasis added). Like the California Court of Appeal, our dissenting colleague would have us abrogate clearly established Supreme Court law. This we are not free to do.

## IV

■ Having identified clearly established Supreme Court law, we must next decide whether the California Court of Ap-

---

11. Even in *Mayer*, the Court made clear that the general rule remained the same. The Court stated that a full transcript must still be provided whenever it "is necessary to assure the indigent as effective an appeal as would be available to the defendant with resources to pay his own way." 404 U.S. at 195, 92 S.Ct. 410. For example, a complete record may be necessary to enable a lawyer to determine what issues should be raised on appeal.

12. The Supreme Court has suggested that where, as here, "a transcript is available and could easily have been furnished," no alternatives proposed by the state will suffice. *Long*, 385 U.S. at 194–95, 87 S.Ct. 362. Since *Britt*, the Court has never approved an alternative to the provision of a complete transcript. The Eleventh Circuit has, however, allowed the state to provide a partial transcript in a case in which defendant's attorneys in the second trial had also represented him during the earlier mistrial and had "access to and took advantage of adequate alternatives or substitutes for the requested transcripts." *Lindsey v. Smith*, 820 F.2d 1137, 1147 n. 14 (11th Cir.1987). Contrary to the dissent's representation, the Eleventh Circuit did not "suggest" in *Lindsey* that where a defendant had access to only portions of a transcript the constitutional mandate was satisfied. *Phegley v. Greer*, 691 F.2d 306 (7th Cir.1982), cited for the same proposition, is also inapplicable *Id.* at 309. The Seventh Circuit held only that where the state routinely does not transcribe preliminary hearings, alternatives to a transcript—such as the presence of trial counsel at the hearing—may suffice under the *Britt* exception (which is not applicable here, *see* text *supra* ).

peal's decision is contrary to or an unreasonable application of that law. When determining whether a decision is either "contrary to" or an "unreasonable application" of AEDPA, the habeas court must examine the last reasoned decision by the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801–02, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). In this case, the California Supreme Court summarily denied review of Kennedy's claim, so the last reasoned state court decision is the California Court of Appeal decision on direct appeal.

In reaching its decision, the Court of Appeal relied on *People v. Hosner*, 15 Cal.3d 60, 123 Cal.Rptr. 381, 538 P.2d 1141 (1975), which adopted, in sum and substance, the applicable Supreme Court precedents, including *Britt*, and which held that "an indigent defendant in a criminal trial who was entitled to a free transcript of a prior mistrial was *presumptively* entitled to a *full* transcript of those prior proceedings." *Id.* at 70, 123 Cal.Rptr. 381, 538 P.2d 1141 (citing *Britt*, 404 U.S. at 227, 92 S.Ct. 431) (emphasis in original). As discussed, applying *Hosner*, the California Court of Appeal concluded that the trial court should have provided Kennedy with a full transcript. If the Court had stopped its analysis here, the determination on the merits would *not* have been contrary to clearly established Supreme Court law.

The California Court of Appeal, however, went on to reject Kennedy's constitutional claim on the basis that in providing Kennedy with only a transcript "of the [tri-al] testimony, the [trial] court substantially complied" with *Hosner*. In so doing, the state court added an additional factor to the Supreme Court rule, and thus its decision was contrary to clearly established Supreme Court law. The alteration of the existing Supreme Court requirements through the addition of the "substantial compliance" doctrine contravened controlling precedent, which requires the state to provide an indigent defendant with a full transcript of the prior proceedings for use in a subsequent trial. *Britt*, 404 U.S. at 227, 92 S.Ct. 431. In sum, because the California Court of Appeal created a new and additional "substantial compliance" exception to the governing Supreme Court rule, and thereby altered or amended the well-established Supreme Court requirement that indigent defendants be provided with a complete transcript of the "prior proceedings," we hold that the state court's decision was contrary to clearly established law. *See Williams v. Taylor*, 529 U.S. 362, 393, 397, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that where the State Supreme Court "mischaracterized at best" the governing rule and read a "separate inquiry" into the established Supreme Court *Strickland* ineffective assistance standard, the writ must be granted); *Benn v. Lambert*, 283 F.3d 1040, 1051, n. 5 (9th Cir.2002) ("The addition, deletion, or alteration of a factor in a test established by the Supreme Court[ ] constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of AEDPA.").[13]

---

13. Were we to conclude that the state court's determination was not contrary to clearly established Supreme Court precedent because we believed that the application of a substantial compliance test does not add an additional factor to the controlling Supreme Court standard, we would be compelled to conclude that the California Court of Appeal decision constitutes an objectively unreasonable application of clearly established Supreme Court law. *See Williams*, 529 U.S. at 409, 120 S.Ct.

1495. To approve the omission of transcripts of critical portions of the proceedings, such as the opening statements and closing arguments, and the motions, hearings and rulings relating to the suppression or exclusion of prejudicial evidence, would constitute an objectively unreasonable application of *Britt* and the related cases, first, because the material omitted, especially the motion and ruling regarding "gang" evidence and the opening and closing arguments, pertained to important as-

## V

■ Where the state completely fails to provide an indigent defendant with a transcript of a mistrial for use in connection with a second trial, we would likely find a structural error, requiring automatic reversal. *See Turner v. Malley,* 613 F.2d 264, 266 (10th Cir.1979) (holding that *Britt* requires automatic reversal where the state fails entirely to provide the defendant with a transcript for use at the second trial and also fails to show the existence of an alternative device that would fulfill the same functions as the transcript); *Martin,* 525 F.2d at 113 (same); *United States v. Pulido,* 879 F.2d 1255, 1257 (5th Cir.1989) (same); *United States v. Talbert,* 706 F.2d 464, 470 (4th Cir.1983) (same); *see also Roberts,* 389 U.S. at 43, 88 S.Ct. 194(reversing the state conviction, granting the writ, and failing to adopt the dissent's suggestion that a separate harmless error analysis should be conducted where the state failed to provide the indigent defendant with a transcript of a preliminary hearing for use at trial). Where the state fails to provide only a portion of the transcript, however, we conclude that harmless error analysis applies. *Cf. United States v. Devlin,* 13 F.3d 1361, 1364–65 (9th Cir.1994) (applying harmless error where the trial court failed to provide the defendant with a transcript of a suppres-

sion hearing conducted prior to trial); *United States v. Rosales–Lopez,* 617 F.2d 1349, 1355(9th Cir.1980) (same). We note, however, that where significant and crucial portions of the proceedings of a first trial are omitted, it will generally be prejudicial to an indigent defendant's ability to prepare an effective defense. *See, e.g., Roberts,* 389 U.S. at 43, 88 S.Ct. 194(holding that the failure to provide defendant with preliminary hearing transcript at which key state witnesses testified was constitutional error requiring reversal). The more significant and crucial the portions of the proceedings omitted, the more likely that we will be compelled to conclude that the defendant was deprived of the "basic tools of an adequate defense." [14] *Britt,* 404 U.S. at 227, 92 S.Ct. 431.

In making a harmless error determination in a habeas case, "[n]ormally a record review will permit a judge to make up his or her mind about the matter. And indeed a judge has an obligation to do so." *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). When reviewing a state court decision to determine "whether the error had a substantial and injurious influence or effect on the verdict," *Brecht v. Abrahamson,* 507 U.S. 619, 627, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), a judge should "ask directly, 'Do I, the judge, think that the error sub-

pects of the proceedings, *Roberts,* 389 U.S. at 41, 88 S.Ct. 194 (holding that defendant must be provided with preliminary hearing transcript at which "major state witnesses" testified), and, second, because the prosecution failed to carry its burden of justifying such omissions. *See Gardner,* 393 U.S. at 370, 89 S.Ct. 580 (holding in favor of indigent defendant who requested a transcript of his habeas corpus proceedings and stating that the state failed to show the existence of an adequate substitute for a full transcript); *Eskridge v. Washington Bd. of Prison Terms and Paroles,* 357 U.S. 214, 215–16, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958) (per curiam) (holding in favor of indigent defendant and stating that

the state failed to show availability of trial notes to substitute for a full transcript); *Hosner,* 15 Cal.3d at 66, 123 Cal.Rptr. 381, 538 P.2d 1141 (holding that the state must overcome the presumption that the defendant is entitled to a complete transcript of the prior trial and meet its burden of showing that an adequate substitute is available at the hearing in the trial court in which the transcript is requested).

14. At the other end of the spectrum, we would be unlikely to find that a failure to provide insignificant and inconsequential portions of the proceedings would result in reversible error.

stantially influenced the jury's decision?' " *O'Neal,* 513 U.S. at 436–37, 115 S.Ct. 992. Further, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence on the jury's verdict, that error is not harmless. And, the petitioner must win." *Id.* at 436, 115 S.Ct. 992(quotations omitted). These principles apply in post-AEDPA as well as pre-AEDPA cases. *Early v. Packer,* 537 U.S. 3, 10, 123 S.Ct. 362, 154 L.Ed.2d 263 (2003); *Penry v. Johnson,* 532 U.S. 782, 795, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

■ Upon review of the record, we conclude that the state court's denial of a complete transcript of prior proceedings had a substantial and injurious effect on the jury's verdict.[15] *Brecht,* 507 U.S. at

15. The dissent would have us forfeit petitioner's constitutional claim on the ground that counsel we appointed on appeal failed to argue adequately the prejudicial effect of the state's constitutional failure to provide the portions of the transcript that it omitted. Our dissenting colleague does not deny that the question of prejudice was presented adequately throughout the state court proceedings and even in the district court where the petitioner represented himself. The issue of course pertains to the prosecution's failure to provide the portion of the transcript relating to its first effort to insert the gang membership issue into the trial in order to inflame the jury and prejudice it against petitioner.

In the state court of appeals, defense counsel argued in his brief that "prejudice from the lack of a complete transcript is demonstrated by the fact defense counsel was obviously unaware of [the prior judge's] ruling during the first trial that the prosecution witnesses were not to refer in any way to appellant's gang membership. As a result on retrial, defense counsel failed to secure a ruling prohibiting the prosecution from [testifying to] gang membership and terminology in front of the jury." Counsel also asserted that "during the first trial, without the inflammatory evidence, the People were unable to persuade the jury of appellant's guilt. By introducing irrelevant and unduly prejudicial evidence, the prosecution essentially assured the trial jury would be inflamed against appellant and convict him." The Court of Appeal opinion considered and ruled on this contention.

Similarly, in the district court, Kennedy, proceeding *pro se,* objected to the magistrate judge's findings and recommendations arguing that a transcript of the first trial would have aided defense counsel by alerting him to make a motion to exclude the gang evidence. He further asserted that the introduction of such evidence was prejudicial and inflammatory. Despite these objections, the district judge upheld the findings and recommendations and certified both the question of whether Kennedy's "right" had been violated as a result of the failure to provide the requested portions of the full transcript and whether the error was harmless.

In his brief to this court, court-appointed counsel argued that the failure to provide the omitted portions of the transcript constituted structural error. The state disagreed. Both parties, however, proceeded at all times from the factual basis provided by the record, i.e., that the material requested by Kennedy and omitted by the state related to gang membership and the suppression hearing in that regard (as well as the opening and closing statements). Because we rejected petitioner's structural error argument, the question we must necessarily answer once a constitutional violation is found is whether the error was harmless. We are obligated to conduct that review on the basis of the "record as a whole." *See Brecht,* 507 U.S. at 638, 113 S.Ct. 1710; *Murtishaw v. Woodford,* 255 F.3d 926, 973(9th Cir.2001) (stating that the inquiry is whether "in light of the record as a whole," the error had a substantial and injurious effect or influence in determining the verdict and conducting a review of the record before granting the petition); *see also Bartlett v. Alameida,* 366 F.3d 1020 2004 WL 1043351 (9th Cir.2004) (conducting harmless error review under *Brecht* based on record presented in habeas case); *Taylor v. Maddox,* 366 F.3d 992, 2004 WL 1043343 (9th Cir.2004) (stating that under *Brecht* the court "must review the evidence at trial" to determine whether on habeas the constitutional error was harmless); *Jackson v. Giurbino,* 364 F.3d 1002, 1010 (9th Cir.2004) (conducting harmless error review under *Brecht* based on record presented in habeas case); *cf. United States v. Galindo,*

627, 113 S.Ct. 1710. The prosecution took advantage of Kennedy's counsel's lack of knowledge regarding the prior trial court order prohibiting gang testimony in order to introduce the prejudicial testimony in the second trial; the state conceded as much during oral argument. The transcript of the trial testimony provided to the defense was devoid of any mention of gang involvement, gang language, or of a witness who would testify to the connection between the two. However, had Kennedy's counsel had access to the missing portions of the transcript of the proceedings—which portions included the discussions regarding the introduction of gang related evidence, the motion to exclude, and the judge's favorable ruling thereon—we have little doubt that Kennedy's counsel in the second trial would have presented a similar motion with a substantial likelihood of success.[16]

■ After hearing arguments from counsel, the first trial judge made a determination that the introduction of evidence tending to show gang affiliation on the part of Kennedy would be highly prejudicial. The case law in this circuit provides

ample support for that conclusion and for the conclusion that the failure to provide Kennedy with the portion of the transcript relating to that evidentiary issue, and the consequent introduction in the second trial of the gang related evidence, was prejudicial. Our cases make it clear that evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error. Evidence of gang membership may not be introduced, as it was here, to prove intent or culpability. *See Mitchell v. Prunty,* 107 F.3d 1337, 1342–43 (9th Cir.1997), *cert. denied,* 522 U.S. 913, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997) (reversing the conviction and holding that evidence of membership in a gang cannot serve as proof of intent, because, while someone may be an "evil person," that is not enough to make him guilty under California law), *overruled on other grounds by Santamaria v. Horsley,* 133 F.3d 1242, 1248 (9th Cir.1998); *see also United States v. Garcia,* 151 F.3d 1243, 1244–46 (9th Cir.1998) (reversing the conviction and stating that it would be contrary to the fundamental principles of our justice system to find a defendant guilty on the basis of his association with gang members). In

---

913 F.2d 777, 779 (9th Cir.1990) (stating that after conducting "a careful review of the record in this case," the error was harmless).

It is helpful when counsel we appoint are familiar with the record and capable of aiding us in our review. That is, unfortunately, not always the case. Nevertheless counsel's failure does not relieve us of our obligation to determine whether the constitutional error that petitioner has established warrants relief. However, wholly aside from that obligation, we may review an issue that is not properly raised, if the failure to raise it does not prejudice the opposing party. *See, e.g., United States v. Ullah,* 976 F.2d 509, 514 (9th Cir. 1992). Here, neither the state nor our dissenting colleague could have been surprised that the question whether the state's failure to provide the transcript was harmless consisted of the identical question that had been litigated in the state and federal courts throughout the proceedings, i.e. the omission of the sup-

pression hearing relating to the gang membership testimony. Nor could anyone have been prejudiced in any way by defense counsel's failure to address the prejudice question more directly.

16. Had new counsel had access to the pretrial proceedings, he would undoubtedly have based a motion to exclude on the arguments already presented and on the prior judge's ruling in favor of the defendant. Had he done so, it is reasonable to believe the second trial court would have agreed that there should be no reference to " 'gangs or gang affiliation' unless cleared by the court out of the presence of the jury" given the highly prejudicial nature of gang testimony, notwithstanding that the second court would not have been bound to do so under the "law of the case." doctrine. *See* 9 Bernard E. Witkin, *California Procedure* § 896 at 930–31 (4th ed.1997).

this regard, we have stated that testimony regarding gang membership "creates a risk that the jury will [probably] equate gang membership with the charged crimes." *United States v. Hankey*, 203 F.3d 1160, 1170 (9th Cir.2000) (internal quotations and citations omitted). We further stated that where, as here, "gang" evidence is proffered to prove a substantive element of the crime (and not for impeachment purposes), it would likely be "unduly prejudicial." *Id.* In sum, the use of gang membership evidence to imply "guilt by association" is impermissible and prejudicial. *Garcia*, 151 F.3d at 1246.

Here, the prosecution, well aware that the first trial court had forbidden the introduction of testimony relating to gang involvement or association in order to establish defendant's guilt, deliberately elicited testimony from Detective McDowell

for this purpose.[17] We conclude that the jurors in Kennedy's case most likely drew impermissible inferences from Detective McDowell's testimony, equating Kennedy's purported gang membership with the charged crime. The fact that the first trial ended in a hung jury and that, following a one day trial, the jury in the second trial deliberated for three days before reaching a verdict, also supports our determination that the refusal to provide Kennedy with a complete transcript had a substantial and injurious effect on the jury's decision.[18] In sum, had a transcript containing the missing portions of the proceedings, including the motion to exclude gang related testimony and the court's favorable ruling thereon, been furnished to the defense, it would have served as precisely the type of "discovery device in preparation for[the second] trial" that *Britt* referred to when explaining why it is necessary to provide the defense with a transcript of the proceedings.[19] 404 U.S. at 228, 92 S.Ct. 431.

**17.** Because the jury during its three-day long deliberation, asked that the court reporter read Detective McDowell's testimony back to them, the jurors heard the impermissible evidence of gang affiliation twice.

**18.** From the fact that the first trial ended in a mistrial, as well as the fact that the jury deliberated for a considerable amount of time in the second trial, we infer that the question as to Kennedy's guilt or innocence was a close one in both trials. That the jury did not find the evidence in the case against Kennedy overwhelming in either the first or second trial makes it even more difficult to draw the conclusion that prejudicial gang testimony, which the jury heard on two separate occasions in the second trial (once during trial and once during its deliberations), was not a substantial factor that tipped the scales against the defendant the second time. *See Murtishaw v. Woodford*, 255 F.3d 926, 974 (9th Cir.2001) (granting the writ because "given the mitigating evidence presented, the jury's apparent interest in it, and the length of the jury's deliberations, [the court was] in 'grave doubt' about whether the jury would have returned a death sentence"); *United States v. Velarde–Gomez*, 269 F.3d 1023, 1036 (9th Cir.2001) (en banc) (stating that "longer jury deliberations weigh against a finding of

harmless error [because] lengthy deliberations suggest a difficult case" and holding that admission of possibly prejudicial evidence required reversal of defendant's conviction where the four-day jury deliberations were "relatively lengthy" for a two-count drug case) (internal citations omitted); *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir.2000) (longer jury deliberations "weigh against a finding of harmless error [because] lengthy deliberations suggest a difficult case"); *Dallago v. United States*, 427 F.2d 546, 559 (D.C.Cir.1969) ("The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner").

**19.** The dissent's argument that defense counsel's failure to object after the jury heard the gang testimony breaks the "chain of causation," Dissent at 1066–67, is based on a faulty premise, namely that an objection would have eliminated the prejudicial testimony from the record or, at the least, from the jurors' memories. Neither assumption is correct. *Cf. Thompson v. Borg*, 74 F.3d 1571, 1581 (9th Cir.1996) (stating that timely instruction does not cure prejudicial impact of evidence if information is highly prejudicial); *Dickson v. Sullivan*, 849 F.2d 403, 408 (9th Cir.1988)

We note that the prejudice in this case stemmed not only from the failure to provide Kennedy with the portion of the proceedings relating to the exclusion of gang related evidence, but also from the omission of other portions of the transcript. We consider at this point only the opening statements and the closing arguments from the first trial. The statements and arguments, which Kennedy explicitly requested but was denied, were also crucial to the development of an effective defense. Various tactical and strategic decisions made by Kennedy's new counsel might have been affected had he been provided with a copy of the prosecutor's opening statement and closing argument; he might, for example, have been able to anticipate some of the prosecution's key arguments, identify potential weaknesses in its case, assess the relative weight that the prosecution would place on various items of evidence, and better determine what would be needed to refute them. As the California Supreme Court itself has explained, as "in the manner of the denial of the assistance of counsel, the denial of a transcript of a former trial infects all the evidence offered at the latter trial, for there is no way of knowing to what extent adroit counsel assisted by the transcript to which the defendant was entitled might have been able to impeach or rebut any given item of evidence." *Hosner*, 15 Cal.3d at 70, 123 Cal.Rptr. 381, 538 P.2d 1141. In hindsight, it is difficult to conclude that the omitted portions of the transcript would not have been important to Kennedy in preparing an effective defense, particularly where, as here, the prosecution had a distinct advantage in presenting the government's case, having knowledge of all that occurred during the course of the first trial. See *Devlin*, 13 F.3d at 1364 (stating that the transcript should have been provided to "place[ ] the defendant on equal footing with the prosecution"). For these reasons, we hold that denying Kennedy a full transcript of the proceedings for use in relation to his second trial was not harmless error.[20]

(stating that where statements concern a defendant's prior criminal behavior, the efficacy of jury instructions is subject to serious doubt); *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.1986) ("To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities"); *see also Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds."); *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) ("The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction.") (Jackson, J., concurring). It is likely that counsel concluded that an objection to testimony suggesting petitioner's gang membership would have made matters worse by calling further attention to the prejudicial disclosure. This is particularly so because defense counsel was unprepared to present an effective argument for inadmissibility having, as a result of the constitutional violation, been entirely surprised by the prosecutor's questioning and the witness's response. Moreover, it is pure speculation at this point as to whether any admonition would have been adequate to cure the prejudice to the defendant. *Thompson*, 74 F.3d at 1581; *see also Lewis*, 787 F.2d at 1323(reversing where prosecution's evidence against the defendant was "weak" and jury instructions were inadequate to cure doubts regarding the prejudicial effect of evidence admitted and prosecutor's statements).

20. The same prosecutorial office conducted the first and second trial, although the lead prosecutor in the two trials was different. Such a change does not affect the analysis of the underlying prosecutorial conduct. *See, e.g., Thigpen v. Roberts*, 468 U.S. 27, 104 S.Ct. 2916, 82 L.Ed.2d 23 (1984) (explaining, in the context of prosecutorial vindictiveness, that a change in prosecutors does not defeat a presumption of vindictiveness); *Santobello v.*

We REVERSE the district court's denial of the petition for writ of habeas corpus and REMAND the matter for issuance of the writ.

FISHER, Circuit Judge, concurring:

I fully concur in the majority opinion, but want to respond specifically to the dissent's suggestion that our conclusion that there was prejudice results from "lawyering from the bench."

The dissent seems to forget that this habeas appeal arises from a criminal case in which the constitutional right of the defendant to a fair trial is the issue, not just "litigation" in which someone wins or loses according to his lawyer's skill, or lack of it. As such, the court's pursuit of the issue of prejudice with the state's attorney—charged with upholding the fairness of the criminal justice system in the course of prosecuting defendants—was not lawyering; it was judging.

Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. While lawyers representing private parties may—indeed, must—do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. As Justice Douglas once warned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the

laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting).

*United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir.1993).

The issue of prejudice was not some hidden, esoteric legal point the parties or the court was unaware of—indeed, the trial judge in the first trial had addressed the highly prejudicial nature of "gang" testimony and precluded the very kind of questioning the state introduced at the second trial. Even had there been no oral argument in this case, the record and written arguments before the court were quite sufficient for us to evaluate the issue of prejudice and any question of waiver. Oral argument—as this court routinely makes clear to counsel—is an opportunity for the court to ask questions, often to give counsel a chance to address a particular judge's tentative conclusions to clarify or even persuade the judge to change his or her mind. Thus the notion that because defendant's appointed counsel could not—for whatever reason—identify one fairly obvious instance of possible prejudice (one the initial state trial judge recognized and made part of the record) "should have ended this matter" is just wrong, if by that the dissent means we as judges must have turned a blind eye to the record and common sense.

As Judge Posner put it—himself borrowing from a lawyer's famous observation—"Judges, by the way, are not wall-

---

*New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427(1971) (holding, in the plea bargaining context, that "staff lawyers in a prosecutor's office have the burden of letting the left hand know what the right hand is doing or has done"); *c.f. Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding, in the *Brady* context, that an "individual prosecutor has a duty to learn of

any favorable evidence known to others....'"). Moreover, there is evidence in the record that the first and second prosecutors actually cooperated in matters relating to the second trial. For example, the first prosecutor made appearances at preliminary proceedings involving the second trial and apparently participated in the handling of some of Kennedy's new counsel's discovery requests.

flowers or potted plants." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir.1988). Or as another of his colleagues observed: "[W]hile a judge should never engage in advocacy from the bench, he or she has an obligation to raise legal issues that the parties have overlooked or neglected.... [T]he judge should take an active role, when necessary, to ensure fairness and to conform the proceedings to the law." *Jones v. Page*, 76 F.3d 831, 850 (7th Cir.1996). The questions posed to counsel, and the majority opinion which I join, are in furtherance of that proper judicial role.

**O'SCANNLAIN, Circuit Judge, dissenting:**

This case represents a triumph of lawyering from the bench. While I share some of the court's evident sympathy for the defendant—whose third strike resulted from the sale of less than one-tenth of one gram of a *legal* substance to an undercover officer[1]—I respectfully dissent from its decision to step into counsel's shoes and tango its way around the deference we owe to state courts as coordinate expositors of federal law.

## I

There is no dispute that Kennedy was entitled to some portion of the transcript from his first trial on these charges. *See generally Britt v. North Carolina,* 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971). The only issue before the court is whether *clearly established* Supreme Court precedent requires the State to have provided him with a complete transcript, *including opening and closing arguments and a recounting of any preliminary trial motions.* The majority cites no Supreme Court case that extends *Britt* beyond a requirement that a transcript of all *testimonial* evidence adduced in prior proceedings be made available to indigent defendants; it finds its clearly established Supreme Court precedent not in the *U.S. Reports,* but in *Black's Law Dictionary.* Opinion at 1046–47, 1048.

If this were a direct criminal appeal, I might not necessarily disagree with the court's interpretation of *Britt.* But on collateral review, our job is not to divine the *best* interpretation of an admittedly *vague* Supreme Court precedent, *see United States v. Kirk,* 844 F.2d 660, 662 (9th Cir.1988) ("[T]he right to free transcripts is not absolute. The Court in *Britt* recognized that the 'outer limits of that principle are not clear.' ") (quoting *Britt,* 404 U.S. at 227, 92 S.Ct. 431),[2] but to determine whether the state court's result in this

---

**1.** Pursuant to California Health and Safety Code § 11355, "Every person who ... offers, arranges, or negotiates to have sold, delivered, transported, furnished, administered, or given to any person any ... liquid, substance, or material in lieu of a[] controlled substance shall be punished by imprisonment in the county jail for not more than one year, or in the state prison." As a "wobbler"—an offense that can be punished as either a felony or misdemeanor, *see Lockyer v. Andrade,* 538 U.S. 63, 67, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)—sale of a substance in lieu of a controlled substance can (as in this case) lead a recidivist to be sentenced to twenty-five years to life under California's Three Strikes Law, Cal.Penal Code §§ 667(e) & 1170.12(c)(2).

Kennedy's prior offenses included disorderly conduct, theft, burglary, battery, and forc-

ible rape; numerous parole violations followed his nine-year incarceration in state prison for the latter offense. *Cf. Ramirez v. Castro,* 365 F.3d 755, 767–69 (9th Cir.2004) (declaring unconstitutional the imposition of a three-strikes twenty-five-to-life sentence on a recidivist whose prior history consisted only of three non-violent shoplifting offenses and who previously had served just six months and 20 days in county jail).

**2.** The majority suggests that *Kirk's* reference to *Britt's own* recognition of its ambiguity is limited to the facts of *Kirk.* Opinion at 1048 n.8. Aside from the weakness of such a proposition, I note that while *Kirk* surely addressed a distinguishable factual scenario, no fair reading of the quoted passage—which opened the court's analysis of *Britt* and its progeny— supports such a limited interpretation. For

case reflected an *objectively reasonable* interpretation of an unmistakably *clear* Supreme Court decision. At least one court has held that the relevant Supreme Court case law does not extend so far as the majority would take it, and given our acknowledgment of *Britt's* fuzzy contours, I have difficulty concluding that the state court's decision unreasonably interpreted clearly established federal law within the meaning of AEDPA. *See Williams v. Leeke*, 444 F.Supp. 229, 232 (D.S.C.1976), *aff'd per unpublished memorandum* 571 F.2d 579 (4th Cir.1978) ("[T]he authorities cited by petitioners to support their contention that the Constitution requires them to obtain a transcript of closing arguments do not recognize such a requirement. A transcript of arguments to a jury is omitted from the requirements set out in *Hardy v. United States*, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964), and *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), and *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975), make no reference to the reduction of argument to the jury into transcript form.") (citations edited); *see also Price v. Vincent*, 538 U.S. 634, 643, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) ("This was not an *objectively unreasonable* application of clearly established law as defined by this Court. Indeed, numerous other courts have refused to find [constitutional] violations under similar circumstances.") (emphasis in original).

The court's castigation of the state tribunal for its creation of a "doctrine of 'sub-

stantial compliance'" presents a red herring. *See* Opinion at 1050. *Britt* itself fails to set forth a rigid requirement that defendants be provided with a transcript in every case, but rather establishes its own rule of substantial compliance—demanding delivery of a free transcript only when doing so "is necessary for an effective defense," *Britt*, 404 U.S. at 227, 92 S.Ct. 431, and failing to find a constitutional violation where a "substantially equivalent" device is available. *Id.* at 230, 92 S.Ct. 431. Read in the charitable light demanded by AEDPA, *see Himes v. Thompson*, 336 F.3d 848, 854 (9th Cir. 2003) (noting AEDPA's demand that courts must "presume ... that state courts know and follow the law and give state court decisions the benefit of the doubt.") (citation and quotations omitted), the state court's reference to "substantial compli[ance]" hardly "created a new and additional ... exception" to established Supreme Court doctrine. *Contra* Opinion at 1052. It simply represents the Court of Appeal's eminently reasonable conclusion that the partial transcript delivered to Kennedy satisfied *Britt's* requirement that indigent defendants be given free access to only those portions of a transcript which are necessary to ground a constitutionally competent defense.

Indeed, the following two sentences of the Court of Appeal's opinion confirm that is precisely what was meant by its allusion to substantial compliance: "Kennedy was afforded a free transcript of all the testi-

---

the sake of ease, I here quote the *Kirk* passage in full:

> The Supreme Court has held that a state 'must, as a matter of equal protection, provide indigent prisoners with the *basic tools of an adequate defense* or appeal, when those tools are available for a price to other prisoners.' *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 30

L.Ed.2d 400 (1971) (emphasis added). However, the right to free transcripts is not absolute. The Court in *Britt* recognized that the 'outer limits of that principle are not clear.' *Id.*

The Court, quite simply, has never clearly held that a transcript of premistrial motions are "basic tools of an adequate defense"— that is, that they fall within the admittedly "not clear ... outer limits" of its doctrine.

mony. He thus had available those crucial portions which might be necessary ... for the purposes of impeaching witnesses and rebutting evidence." *Kennedy v. Terhune,* No. D027718 at 6 (Cal. Ct.App. filed Sep. 8, 1998). Nonetheless, the majority once again faults the state appellate court's reaching the same conclusion that at least one of our sister circuits has suggested. *See Phegley v. Greer,* 691 F.2d 306, 309 (7th Cir.1982) ("Due process does not always require the state to provide a full transcript to an indigent defendant *if a partial transcript* or appropriate substitute is made available.") (emphasis added), *cert. denied* 459 U.S. 946, 103 S.Ct. 262, 74 L.Ed.2d 204 (1982); *see also Lindsey v. Smith,* 820 F.2d 1137, 1148 (11th Cir.1987), *cert. denied* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989) ("Moreover, in contrast to *Britt,* appellant's attorneys had access *to portions of the actual transcripts* of the first trial.").

The majority's only cogent critique of the Court of Appeal's conclusion that Kennedy had all he needed to prepare a constitutionally effective defense is its vague assertion that "motions to suppress or exclude often reveal, as here, information regarding damaging and prejudicial evidence that the state plans to introduce, and the rulings thereon may sometimes be case-dispositive." Opinion at 1048. But there are two serious problems with this conclusory reasoning. First, the majority utterly fails to explain why such evidence cannot be adequately and effectively dealt with by contemporaneous objection when it is encountered in the courtroom.[3] For a complete transcript truly to be "*necessary* to an effective defense," *Britt,* 404 U.S. at 227, 92 S.Ct. 431 (emphasis added), it must be more than merely *helpful. See Webster's Third New Int'l Dictionary* 1510–11 (1986) (defining necessary as "of, relating to, or having the character of something that is logically required ... that cannot be done without; that must be done or had; absolutely required; essential, indispensable."); *cf.* Opinion at 1047 ("In asking this court to limit the meaning of 'prior proceedings' to a transcript of witness testimony, the state would have us construe the term so as to violate its ordinary and plain meaning. We are not free to do so."). At bottom, the majority offers only a thinly-reasoned justification to support its extension of precedent beyond that clearly established by the Supreme Court.[4]

---

3. The majority's suggestion that an objection would have been ineffectual because it may not have removed the prejudicial testimony from the jurors' minds, Opinion at 1056–57 n.19, not only contradicts case law establishing that jurors are generally presumed to follow the instructions of the court, *see, e.g., United States v. Griffith,* 301 F.3d 880, 884 n. 3 (8th Cir.2002) ("[T]he district court instructed the jury that the statements and comments of the prosecutor are not evidence. Because jurors are presumed to follow their instructions, this provides further evidence that Griffith suffered no prejudice as a result of the prosecutor's allegedly improper remarks.") (citation omitted); *United States v. Magana,* 127 F.3d 1, 6 (1st Cir.1997) ("Within wide margins, the potential for prejudice stemming from improper testimony can be satisfactorily dispelled by appropriate curative instructions. Jurors are presumed to follow such instruc-

tions, except in extreme cases.") (citations, quotations, and alterations omitted); *United States v. Bullock,* 71 F.3d 171, 175 (5th Cir. 1995) ("[T]he court admonished the jury that it could consider Bullock's prior felony conviction only in connection with the firearm count. Any possible prejudice could be cured with proper instructions and juries are presumed to follow their instructions. Therefore, the jury instructions were sufficient to cure any possible prejudice."), but also case law demonstrating precisely how effective objections and instructions can be. *See infra* at 7890 (collecting cases).

4. Contrary to the majority's assertion, I do not "put the burden on the defendant to prove that there is a 'need' for the transcript" tailored to the particular facts of his case. Opinion at 1051. That might indeed create tension with *Britt's* holding that a trial court

Second, the majority entirely overlooks the fact that—as a constitutional matter—the admission of prejudicial evidence generates reversible error only when it "renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing *Darden v. Wainwright*, 477 U.S. 168, 179–183, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)). Thus, whatever value there may be in securing the exclusion of potentially prejudicial evidence from the courtroom prior to the commencement of trial, the fact that the courts subject the ultimate admission of prejudicial evidence to such a stringent standard of review evinces a constitutionalized conclusion that excluding such evidence by pre-trial motion is hardly necessary to securing a fair trial or guaranteeing a constitutionally effective defense. Otherwise, the courts long ago would have established a per se rule of ineffectiveness for failure to object to the admission of prejudicial statements at trial. Yet we have soundly rejected that proposition. *See, e.g., Phyle v. Leapley*, 66 F.3d 154 (8th Cir.1995) ("[Due to] the kinds of broad, highly subjective factors that trial lawyers must take into account as they make repeated, instantaneous decisions whether to object to a question, whether to move to strike a damaging unresponsive answer, or whether to move for a mistrial when a witness has delivered an unexpected low blow[,][w]hen we review such trial decisions, the ineffective assistance standard is high—they are 'virtually unchallengeable'—in part because appellate judges cannot recreate from a cold transcript the courtroom dynamics

that are an essential part of evaluating the effectiveness of counsel's performance.") (quoting 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 11.10, at 95 (1984)).

Viewed in this light, the state court's decision rejecting Kennedy's assertion of *Britt* error was neither contrary to, nor an unreasonable application of, clearly established federal law as set forth by the Supreme Court.

## II

Even if it were objectively unreasonable for the state Court of Appeal to have concluded that a transcript of prior pretrial motions was not "needed for an effective defense"—which is was not—it was not objectively unreasonable for the Court of Appeal to have concluded that any resulting constitutional error was harmless.

## A

Notwithstanding more than twenty years of Ninth Circuit jurisprudence making clear that *Britt* errors are subject to harmless error review, *see, e.g., United States v. Rosales–Lopez*, 617 F.2d 1349, 1355–56 (9th Cir.1980), and despite the fact that the Certificate of Appealability issued by the district court directed Kennedy to address "whether denial of a transcript of pretrial proceedings and motions in limine was a denial of Petitioner's rights *and whether it was harmless error*," petitioner's opening brief failed to allege that any prejudice stemmed from the trial court's refusal to provide him a complete tran-

---

may not base its denial of a petitioner's request for a transcript on his failure to show *"particularized* need." *Britt,* 404 U.S. at 228, 92 S.Ct. 431 (emphasis added). Instead, I place the burden on the *majority* to justify *its* novel articulation of a thin rationale supporting the extension of prior precedent in order to impose a general requirement that indi-

gents must be given a transcript of all non-testimonial preliminary proceedings; and to demonstrate that the state court objectively unreasonably concluded that, as a general matter, delivery of a partial transcript recording all testimony enables a constitutionally-effective defense.

script, asserting instead that no such showing was necessary. *See Alaska Ctr. for the Env't v. United States Forest Serv.,* 189 F.3d 851, 858 n. 4 (9th Cir.1999) ("Arguments not raised in opening brief are waived.").

Even after the state's responsive brief conclusively demonstrated that his claim was subject to harmlessness review, Kennedy did not suggest that he was in any way prejudiced until the final sentence of his reply brief. *See Bazuaye v. INS,* 79 F.3d 118, 120 (9th Cir.1996) ("Issues raised for the first time in the reply brief are waived."); *see also Sophanthavong v. Palmateer,* 365 F.3d 726, 737 (9th Cir.2004) (noting the "obvious" prejudice wrought by allowing litigants to raise arguments for the first time in reply: doing so deprives opposing counsel of "the opportunity to point to the record to show that the new theory lacks legal or factual support").[5] Yet even then he was unable to identify any specific reason why counsel's lack of access to a complete transcript affected the outcome of his second trial. *Cf. United States v. Anzalone,* 886 F.2d 229, 232 (9th Cir.1989) ("The second reason that appellant's claim fails is that [he] has not pointed to any specific prejudice he has suffered from the alleged errors in the transcripts.... [E]ven assuming there were omissions in the transcripts, appellant cannot prevail without a showing of specific prejudice.").

It is particularly curious that the majority seeks to escape Kennedy's waiver by pointing to the state's alleged factual concessions at oral argument. *See* Opinion at 1055. Let's have a look at what actually happened at the oral argument. Recognizing that we long have held *Britt* error

subject to harmlessness review, the court had repeatedly prodded petitioner's counsel to identify some plausible instance of actual prejudice stemming from the trial court's failure to furnish his client a transcript of the pre-mistrial motions. The majority's final exchange with Kennedy's counsel during his opening argument is most illuminating:

> [Counsel for Kennedy]: ... If the new counsel had had [a complete transcript], he would be much-better equipped.
>
> [Court]: Well, that's true. I mean, I think one can assume that the—more information is better than no information, or some information. So let's accept that premise. Is there anything you can point to that occurred in the second trial—there was a mistrial on the first one, right?
>
> [Counsel for Kennedy]: Yes.
>
> [Court]: Okay. So in the second trial, was there something that you can point to where it's clear that, had [petitioner] had the full trial transcript, he would have avoided some prejudicial episode?
>
> [Counsel for Kennedy]: *Not as I stand here.* But I will say—
>
> [Court]: Well then maybe you should sit down for a while, and on rebuttal maybe you can figure out your case.

That highlighted admission—following a ten second silence during which counsel searched in vain for some answer to the court's question—should have ended this matter. Aware that, beyond having waived it in the briefs, Kennedy's counsel had thus conceded the critical argument in this litigation, counsel for the State rose with the intention of only briefly addressing the court. In remarks lasting just 30

---

**5.** The majority's suggestion that no one could "have been prejudiced in any way by defense counsel's failure to address the prejudice question more directly," Opinion at 1054–55 n. 15, thus flatly contradicts our court's well-

established—and just recently restated—understanding of how a party's failure adequately to brief an issue prejudices the opposing party.

seconds, counsel noted that we long have held that *Britt* error is subject to harmless error review, and that petitioner had failed to identify any prejudice. The following exchange with the majority ensued:

[Counsel for the State]: Unless the court has any questions, I—I believe that there's . . .

[Court]: Yes. I have a question.

[Counsel for the State]: Yes, your honor.

[Court]: Umm . . . There was gang testimony at the second trial and not at the first. Right?

[Counsel for the State]: I believe that's correct, your honor.

[Court]: And at the first trial, the district court excluded references to his membership in a gang. Right?

[Counsel for the State]: I believe that is correct, your honor, yes.

[Court]: And that was done at a pre-trial hearing with a motion. And that part of the transcript was not furnished for the second trial. Right?

[Counsel for the State]: I believe that's correct, your honor.

[Court]: And, as a result, the lawyer was not aware of the issue, and didn't object. And the evidence was admitted. Right?

[Counsel for the State]: Yes, your honor.

[Court]: And we have a number of cases that establish how prejudicial the introduction of gang testimony is. Right?

[Counsel for the State]: Yes, your honor, depending on the nature and the circumstances of gang testimony that is introduced.

[Court]: Well, in this case, it was introduced gratuitously, by the deputy district attorney asking for an elaboration on what "cuz" meant. Right?

[Counsel for the State]: Yes, your honor, but I believe it was limited to the definition of what "cuz" meant, or could have meant.

[Court]: Well, what was it relevant to?

[Counsel for the State]: Umm . . . I—I believe it was, it may have been relevant to the area and the, the drug deal, the drug transaction.

[Court]: The fact that he was part of a gang. Right?

[Counsel for the State]: That's right.

[Court]: There's a minute order which was entered in the first case that said there will be no mention of gangs or gang affiliation unless clearly—unless cleared by the court out of the presence of the jury. That one came after the hearing on which it was made clear of the prejudicial nature of gang testimony. Did the same district attorney, deputy D.A. Clabby, try the second trial?

[Counsel for the State]: I am not sure.

[Court]: Well if the first judge thought it was prejudicial, why shouldn't we just assume, therefore, that prejudice is established in the second trial. Counsel (a) didn't know about the issue, didn't know about the prior ruling, and presumably the state did. And yet in the face of that prior minute order, the state went ahead and let its witness—in fact, invited its witness—to go ahead and inject the issue of gangs. Why isn't that sufficient to establish error? . . .

By the time the State's argument time had expired, Kennedy's counsel had been so embarrassed by the court's relentless interrogation of counsel for the State—and by its viscerally derisive display of frustration at the close of his opening argument—that he began his rebuttal with an offer of atonement:

[Counsel for Kennedy]: I apologize to the court for missing that clear argument about the gang testimony.

Now, I have nothing but the greatest respect for my panel colleagues' lawyerly acumen. But I do not find its exercise compatible with the basic obligations of the office we share. As judges, the essence of our role is restrained service as impartial arbiters of disputes framed by litigants. It is not, I respectfully suggest, to act as backup counsel when litigants make poor arguments, or when they come into court without first having "figure[d] out" their cases [6]—even when doing so is motivated by a well-intentioned, but unavoidably standardless "philosophy of law ... infused by concepts like ... social justice." [7]

Indeed, it was just a few months ago that today's majority offered almost precisely that admonition. In proceedings arising out of a case we resolved following an oral argument held *the very same morning we heard this appeal,* an order signed by Judges Reinhardt and Fisher instructed: "Given the overwhelming volume of work which today confronts our courts, we do not generally favor requiring judges ... to search out and research arguments that the other side does not make ...." *Gwaduri v. INS,* 362 F.3d 1144, 1146 (9th Cir.2004). But what's

sauce for the goose is supposed to be sauce for the gander. "Right?"

Events transpiring after initial publication of the majority's opinion granting Kennedy relief make clear the dangers inherent in my colleagues' eagerness to overreach from the bench. In their prior opinion—helping prove the wisdom of the age-old adage that "bad facts make bad law"—the majority repeatedly emphasized the bad "fact" that a single prosecutor was responsible for both of Kennedy's trials. For instance, the court noted in now-deleted language developing the factual basis for its decision that "[t]he prosecutor remained the same for both trials; he, thus, had personal knowledge of all that transpired during the prior proceedings," *Kennedy,* 372 F.3d 1013, 1016–17 (9th Cir. 2004), and it emphasized that "[d]uring the second trial, the prosecutor, who was aware that the prior trial judge had excluded any mention of Kennedy's alleged gang involvement, proceeded, deliberately, to elicit testimony from Detective McDowell on the subject of gangs." *Id.* at 1017. Ultimately, the court concluded,

> In hindsight, it is difficult to conclude that the omitted portions of the tran-

---

**6.** The majority's novel assertion that the habeas petitioner himself need neither argue nor identify prejudice because we must gauge the existence of prejudice in light of the record as a whole merely begs the question. Opinion at 1054–55 n.15. For who could deny that *when* we assess prejudice we must do so based on the complete record, as opposed to a fragmentary image of proceedings below? The real question, which the majority fails to answer, is what triggers such an assessment *in the first instance.* I submit that—as with any other claim courts are called upon to address—we only assess prejudice once the petitioner argues that he has been harmed in some specific way by an alleged constitutional error. The majority simply confuses a statement of how we must analyze well-preserved claims of prejudice with the untenable con-

clusion that such arguments can never be waived.

**7.** Stephen Reinhardt and Howard Bashman, 20 Questions for Circuit Judge Stephen Reinhardt of the U.S. Court of Appeals for the Ninth Circuit, *available at* http://legalaffairs.org/howappealing/20q/ 2004_02_01_20q-appellateblog—archive.html (quotation marks omitted); *see also* Stephen Reinhardt, *The Role of Social Justice in Judging Cases,* Keynote Speech at the University of St. Thomas Law Journal Symposium Honoring Judge John T. Noonan, Jr. (Oct. 18, 2003) ("[S]ocial justice is a substantive legal principle that pervades all aspects of the law from torts to Social Security claims. The purpose of our legal system is not to provide an abstract code of rigid rules; rather it is to promote values that are compatible with the vision of a just existence for all individuals.").

script would not have been important to Kennedy in preparing an effective defense, particularly where, as here, the prosecutor had a distinct advantage in presenting the government's case, having been present when the defense delivered its opening and closing arguments and throughout all of the proceedings both before and during the first trial. *Id.* at 1029–30.

From such factual characterizations, one would have thought this case is, at bottom, about an overzealous prosecutor's nefarious plot to railroad a hapless defendant. How ... socially unjust! There is only one problem: The State's petition for rehearing en banc—which, by the way, is the first opportunity the State has had to respond to the majority's lawyering at the oral argument—reveals that *different* prosecutors handled Kennedy's two trials. The majority's factual predicate was utterly baseless.

In the end, one would be hard-pressed to find a better illustration of what *Sophanthavong* had in mind when it identified how clearly prejudicial it can be for a court to overlook a party's clear waiver (not to mention a party's outright concession, as in this case): "The unfairness of such a tactic is obvious. Opposing counsel is denied the opportunity to point to the record to show that the new theory *lacks legal or factual support.*" *Sophanthavong*, 365 F.3d at 737 (emphasis added).

### B

Kennedy's personal failure to present any cogent basis for thinking he was prejudiced by the state trial court's alleged *Britt* error aside, the thin reed relied upon by the majority hardly suffices to demonstrate that the Court of Appeal's finding of harmlessness was objectively unreasonable. In its decision on direct appeal, the Court of Appeal noted that beyond Detective McDowell's statement that "a lot of people use ['cuz']," the *prosecution* elicited an acknowledgment from McDowell that the term often is used simply to refer to people from one's own neighborhood. *See Kennedy v. Terhune*, No. D027718 at 7. It is perhaps for that reason that the defense *never objected* to McDowell's testimony regarding gang affiliation: Considered in context, McDowell's "allusion to gang membership was not significant." *Id. & id.* at 17. Indeed, it was laughable—as the Court of Appeal quite reasonably concluded.

Defense counsel's failure to object to the testimony has an additional significance: It undermines the chain of causation the majority uses to connect the trial court's failure to provide Kennedy a complete transcript to some meaningful error on retrial. The court speculates that, on notice of the need to object to McDowell's potentially prejudicial testimony concerning Kennedy's possible gang affiliation, there is "little doubt that Kennedy's counsel in the second trial would have presented a similar motion with a substantial likelihood of success." Opinion at 1054. Indeed, the majority tells us that counsel "would undoubtedly have based a motion to exclude on the arguments already presented." *Id.* at 1055 n. 16. Yet, confronted in court with McDowell's etymological testimony, counsel did not even seek to exclude it from the record as irrelevant or prejudicial. The majority's confidence that counsel would have acted differently prior to trial thus defies sound reason.

At the same time it undermines the majority's speculative chain of causation, counsel's failure to object to McDowell's testimony breaks it. For, in a variety of contexts, we have repeatedly recognized that contemporaneous objections can prevent reversible error stemming from the improper admission of prejudicial remarks by providing an opportunity for the court

to purge the record or offer a curative instruction. *See, e.g., Davis v. Woodford,* 333 F.3d 982, 997(9th Cir.2003) (prosecutorial misconduct/documentary vouching); *Bird v. Glacier Elec. Coop., Inc.,* 255 F.3d 1136, 1148(9th Cir.2001) ("Doubtless, contemporaneous objections at trial are to be encouraged. Where objections are made, there may be an opportunity for the trial judge to foreclose further error or to provide a curative instruction.") (civil litigation/appeal to racial prejudice); *Dubria v. Smith,* 224 F.3d 995, 1002 (9th Cir.2000) (improper admission of pre-trial law enforcement officer statements); *Nevius v. Sumner,* 852 F.2d 463, 470 (9th Cir.1988) ("Although the prosecutor's behavior at trial might have approached misconduct, any error could have been cured by contemporaneous objections.") (prosecutorial misconduct/argumentative vouching); *Jeffries v. Blodgett,* 5 F.3d 1180, 1192 (9th Cir.1993) (prosecutorial misconduct/commenting on defendant's refusal to testify); *U.S. v. Schuler,* 813 F.2d 978, 982 (9th Cir.1987) (prosecutorial misconduct/referencing a non-testifying defendant's out-of-court behavior); *U.S. v. Stephens,* 486 F.2d 915, 918 (judicial misconduct/instructing jury on how to weigh evidence); *see also supra* at 6, n. 3. Thus, whatever impact McDowell's gang testimony may have had on Kennedy's trial—and again it was not unreasonable to conclude that it had none—it cannot be attributed to the trial court's refusal to deliver Kennedy a complete transcript of his initial trial.

Were this not enough, the State's petition for rehearing en banc drives yet another nail through the heart of the court's opinion. Perhaps the most important step in the majority's logic was its assertion that the court on retrial would have been bound by the previous decision to exclude any gang testimony from Kennedy's mistrial, such that any motion by Kennedy to exclude such testimony would have had "a substantial likelihood of success," *Kennedy,* 372 F.3d at 1027:

> Although we have found no California cases addressing the exact issue presented here, generally "under the law of the case doctrine and general principles of comity, a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently." *United States v. O'Keefe,* 128 F.3d 885, 891 (5th Cir.1997). A second judge will generally follow a ruling made by an earlier judge unless the prior decision was erroneous, is no longer sound, or would create an injustice. *Id.* None of the exceptions to the application of this basic doctrine exists here.

*Id.* at 1027 n. 16.

Not so fast. Like its unsupported (and, until the State's petition for rehearing en banc, unrebutted) assertion that a single prosecutor was responsible for both Kennedy's mistrial and retrial, the majority's resort to generic law of the case principles turns out, again, to have been utterly baseless. For as the State points out in its petition for rehearing en banc—again taking advantage of its first real opportunity to respond to arguments developed and deployed by the majority at oral argument—law of the case doctrine actually does not apply to trial court decisions in California. *See* 9 Bernard E. Witkin, *California Procedure* § 896 at 930–31 (4th ed.1997) (collecting cases). Poof! Gone is the premise for the majority's speculative prediction that a motion to exclude gang testimony would almost certainly have been granted at retrial; in reality, the majority has absolutely no idea whether a motion to exclude would have been successful or not. At bottom, given the (new) prosecutor's efforts to minimize the impact

of the already laughable gang testimony, and in light of the severe gaps in the majority's speculative chain of causation between any alleged *Britt* error and the introduction of gang testimony on retrial, no fair-minded jurist could conclude that it was objectively unreasonable for the Court of Appeal to have determined that any constitutional error was harmless.

Finally, I observe that there were ample additional reasons to believe that McDowell's allegedly prejudicial statements did not impact the jury's determination that Kennedy had committed the offense charged. In addition to the detective's persuasive testimony concerning the circumstances of petitioner's sale of a non-controlled substance in lieu of a controlled substance, Kennedy's "cousin," Randall Tucker, testified to delivering McDowell the paper bag containing the non-controlled substance (though he denied his own intent and any misrepresentation of its contents). As a result of that denial, the prosecution then lawfully impeached Tucker with evidence that he had pled

guilty to the very offense at issue in Kennedy's trial. Given such powerful trial testimony to the jury suggesting petitioner's guilt, it seems something of a stretch to think that the jury's verdict would have been different had McDowell not been allowed to intimate that, among other completely innocuous meanings, the lingo "cuz" had gang significance.[8]

### III

Apparently in search of a result, the majority yet again runs roughshod over the principles of comity and federalism underlying the Antiterrorism and Effective Death Penalty Act. "[P]remised on the fact that the state courts, as part of a coequal judiciary, are competent interpreters of federal law deserving of our full respect," *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.2003), AEDPA mandates a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and adamantly "demands that state court decisions be given the benefit of the

---

**8.** Though superficially plausible, we have previously declined to adopt the majority's theory that lengthy deliberations necessarily support a finding of prejudicial error. *See* Opinion at 1056 & n.18. Indeed, in *United States v. Galindo*, 913 F.2d 777, 779 (9th Cir.1990), we drew precisely the opposite inference. There, we addressed two criminal defendants' claims that they were incurably prejudiced by the judge's reference to ongoing plea negotiations. Rejecting the assertion, "we note[d] that the jury deliberated approximately three full days after a trial that lasted about that same length of time. Although this is a circumstance which in a given case can indicate a confused jury, here it negates any suggestion that the jury was stampeded to a verdict against the [defendants] out of prejudice resulting from the district court's statement at trial about plea negotiations." *Id.* at 779.

I do not mean to suggest that *Galindo* rules out the majority's argument. Indeed, we have reached such a conclusion in other cases. *See, e.g., Dyas v. Poole,* 317 F.3d 934,

937 (9th Cir.2003) (per curiam); *Jennings v. Woodford,* 290 F.3d 1006, 1019 (9th Cir. 2002). But the majority's opinion in this case hinges on the introduction of prejudicial testimony—precisely the kind of occurrence that, like a judge's indication to the jury that a defendant is considering pleading guilty, could lead a jury to "stampede[ ] to a verdict." As in *Galindo*, that did not happen here. And the fact that we have refused to draw the majority's inference on direct appeal in closely analogous circumstances in turn supports the reasonableness of the state court's decision not to draw the inference below. For if a "difference of opinion among the courts of appeal [means] we cannot say that the state court unreasonably applied clearly established Federal law," *Bailey v. Newland,* 263 F.3d 1022, 1032 (9th Cir.2001), then a difference of opinion *within this* court of appeals would seem to suggest that we may not conclude that the state court's harmlessness determination was objectively unreasonable.

doubt." *Brodit v. Cambra,* 350 F.3d 985, 987 (9th Cir.2003) (quotation and citation omitted). Notwithstanding the eminent reasonableness of their colleagues' analysis, two judges today inform seven others—a state trial judge, three state appellate judges, a federal magistrate judge, a federal district court judge, and a federal appellate judge (and that's not to mention the seven Justices of the California Supreme Court who summarily denied Kennedy's state petition for review)—that their understanding of the law is contrary to clearly established Supreme Court precedent. Again, one is tempted to ask: "Objectively, who is being unreasonable?" *Payton v. Woodford,* 346 F.3d 1204, 1225 (9th Cir.2003) (en banc) (Tallman, J., joined by Kozinski, Trott, Fernandez, and T.G. Nelson, JJ., dissenting), *cert. granted sub nom. Goughnour v. Payton,* 541 U.S. ——, 124 S.Ct. 2388, 158 L.Ed.2d 962, 2004 WL 102831 (May 24, 2004).

Our apparent inability to internalize AEDPA's strict standard of review has become a source of repeated public embarrassment. During the past two terms alone, we have been summarily reversed by a unanimous Supreme Court no fewer than *four times* for disregarding AEDPA's strict limitations on the scope of our collateral review of state court constitutional adjudications. *Middleton v. McNeil,* 541 U.S. ——, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004) (per curiam), *rev'g* 344 F.3d 988 (9th Cir.2003); *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam), *rev'g Gentry v. Roe,* 320 F.3d 891 (9th Cir.2002); *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam), *rev'g* 288 F.3d 1097 (9th Cir.2002); *Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam), *rev'g Packer v. Hill,* 291 F.3d 569 (9th Cir.2002). Because we are once again "nowhere close to the mark," *Yarborough v. Alvarado,* 541 U.S. ——, 124 S.Ct. 2140, 158 L.Ed.2d 938, 2004 WL 1190042 (June 1, 2004), *rev'g Alvarado v. Hickman,* 316 F.3d 841 (9th Cir.2002), I lamentably, yet respectfully, dissent.